**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------- x
MICHAEL PLUDE,                   :
                                 :
          Plaintiff,             :  Civil No. 3:12-cv-0069 (AWT)
                                 :
v.                               :
                                 :
REBECCA ADAMS, DAVID L. GUAY,    :
THOMAS REYNOLDS, JOHN T.         :
PETRILLO, JR., and STATE BOARD   :
OF ACCOUNTANCY                   :
                                 :
          Defendants.            :
------------------------------- x
```

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Michael Plude ("Plude"), brought this action against Officer John T. Petrillo, Jr. of the Shelton Police Department ("Petrillo"), Rebecca Adams ("Adams"), David L. Guay, Thomas Reynolds and the Connecticut State Board of Accountancy. The court has dismissed all claims against Adams, David L. Guay, Thomas Reynolds and the Connecticut State Board of Accountancy. As to Petrillo, Plude brings a claim for false arrest pursuant to 42 U.S.C. § 1983 and a common law claim for malicious prosecution. Petrillo moves for summary judgment on both claims. For the reasons set forth below, Petrillo's motion for summary judgment is being granted.

## I.   FACTUAL BACKGROUND

Plude is a certified public accountant and a partner in an accounting firm.  From 1999 until July 2008, he provided accounting services to Pioneer Gas & Appliance Inc. ("Pioneer").

This action arises out the Shelton Police Department's investigation and arrest of Plude, pursuant to a warrant, for health insurance fraud in violation of Connecticut General Statutes § 53-442 and conspiracy to commit health insurance fraud in violation of Connecticut General Statutes § 53a-48.

Under Connecticut General Statutes § 53-442, a person is guilty of health insurance fraud if he:

> with the intent to defraud or deceive any insurer . . . presents or causes to be presented to any insurer or any agent thereof any written . . . statement as part of . . . an application for any policy of insurance . . . knowing that such statement contains any false, incomplete, deceptive or misleading information concerning any fact or thing material to such claim or application, or omits information concerning any fact or thing material to such claim or application . . . .

As discussed below, Petrillo conducted the investigation of Plude, which revealed, among other things, that: (a) Plude had submitted an application for health insurance with Anthem Blue Cross Blue Shield Insurance ("Anthem") through Pioneer, which stated that he worked 40 hours per week for Pioneer as its Treasurer and his date of full-time hire was December 17, 2006; and (b) Pioneer denied that it ever employed Plude.  Plude was

arrested for the charges described above pursuant to an arrest warrant on June 25, 2009.[1]

Petrillo's investigation of Plude began on July 22, 2008, when Pioneer asked the Shelton Police Department to help retrieve certain company records from Plude, whose relationship with Pioneer had been terminated because he was suspected of fraudulently using the company's money.  Petrillo subsequently learned that Anthem, Pioneer's medical insurance carrier, had filed an Insurance Fraud Report with the Connecticut Insurance Department against Plude for fraudulently receiving medical benefits through Pioneer during the period from September 1, 2007 through August 1, 2008 (the "Anthem Insurance Fraud Report").  Petrillo received a copy the Anthem Insurance Fraud Report, dated September 16, 2008, which described the following "suspected fraudulent activity" by Plude:

> [Pioneer's] "Corporate Secretary" Lorraine Tirella [told Anthem that Plude] had himself added to Pioneer's Anthem group insurance coverage without authorization to do so; he was never an employee of the company.  Plude, it is believed, also managed to get himself designated in State of [Connecticut] filings as the "treasurer" for Pioneer.  Plude and his family . . . had health insurance coverage with Anthem, through Pioneer, from 09/01/2007 through 08/01/2008 (when Pioneer had Plude's family coverage cancelled). . . . It is believed that Plude dealt directly with [insurance agent] Fredrick Serra . . .

---

[1] The court notes that the document both sides refer to as the application for the arrest warrant for Plude is undated and appears on its face to seek a warrant for the arrest of Joanne Wilson, Plude's alleged coconspirator.

to get himself added to the Pioneer Gas health plan
with Anthem. . . . [A]ll documents specific to Anthem
coverage for any Pioneer employee had traditionally
been sent to Serra from Pioneer; the documents for . .
. Plude and his family were between Plude, from his
office at [his accounting firm], and Serra, and appear
to have bypassed involvement from Pioneer. It is
believed that . . . [Pioneer's former bookkeeper,
Joanne Wilson,] devised a plan to cut Pioneer payroll
checks for Plude, in an amount . . . that would cover
the usual payroll deductions and leave just enough
"net" to cover the cost for Plude's family health
insurance coverage . . . . Joanne Wilson was fired by
Pioneer Gas when this scheme came to light and
Pioneer's relationship with Plude was severed as well.
. . . [Serra] stated that "as a vendor" he was led to
believe (but did not say by whom) that Plude had a
very active role at Pioneer and was doing more things
"strategically" for the company.  Serra claims that if
he spoke with Plude about Pioneer's health benefits,
he was always referred back to Joanne Wilson.  [Serra]
never questioned Plude's coverage because he was of
the belief that Plude was actively managing Pioneer
business and that arrangements were made for said
coverage.  Serra was asked about what he thought when
Plude, who is a partner in his own [accounting] firm,
asked him to cancel the health coverage he had with
[the Connecticut Business and Industry Association]
and put him on Pioneer's plan with Anthem.  He said he
didn't question it because he's seen similar
situations in the past and he was under the belief
that Plude was "actively involved in Pioneer company
management."

(56(a)2 Stmt., Ex. 6 at 1-2.)

Over the course of the investigation that followed,

Petrillo obtained, among other things, records related to

Plude's health insurance coverage and professional relationship

with Pioneer, and statements and reports from Pioneer employees

and others.

On February 25, 2009, Petrillo interviewed Pioneer's insurance agent, Fredrick Serra ("Serra").  According to Petrillo's case/incident report, Plude told Serra in August 2007 that he "was now running Pioneer", and shortly thereafter he applied to receive benefits through Pioneer, which Tirella and Joanne Wilson (Pioneer's former bookkeeper) ("Wilson"), "would also approve."  (56(a)2 Stmt., Ex. 7 at 1.)  During the interview Adams indicated that her agency, the State Board of Accountancy, was also investigating Plude's conduct.

On April 30, 2009, Petrillo obtained a copy of Plude's insurance application, which stated that his employer was Pioneer, his occupation was Treasurer, he worked 40 hours per week, and his date of full time hire was December 7, 2006. Health insurance benefits through Pioneer were limited to Pioneer employees who worked 30 hours or more per week.

On May 6, 2009, Pioneer's Vice President, Ralph Tirella ("Tirella"), provided Petrillo a written statement that contradicted material information in Plude's health insurance application.  Tirella stated that he had been in charge of hiring at Pioneer since March 2005, Plude was never an employee of Pioneer, Plude was an independent contractor who performed accounting services for Pioneer through his accounting firm, Plude was not authorized to add himself to the Pioneer medical insurance plan because he was never an employee, and Tirella was

not aware that Plude enrolled himself on Pioneer's insurance plan until several months after he had done so.

Petrillo received a number of documents from Pioneer that were inconsistent with information in Plude's health insurance application.  Although Plude's application stated that he worked for Pioneer full time, his new employee information form and weekly paystubs showed that he received an annual salary of $23,316.60, which was equal to the cost of his medical insurance, after deductions. Also, Pioneer's payroll journal showed that Plude was not paid during a week when Wilson did not complete the payroll journal.

The documents were also inconsistent with Plude having a December 2006 start date at Pioneer.  Plude's new employee information form listed his start date as October 3, 2007, Pioneer quarterly earnings reports and a workers compensation audit showed that Plude was not listed as an employee of Pioneer until the fourth quarter of 2007, and bills from Plude's accounting firm showed that it continued to do work for and bill Pioneer until as late as August 6, 2007.

Plude disputes much of the information that Petrillo collected during his investigation.  In summary, he states that he became the Treasurer of Pioneer and a Pioneer employee in December 2006, and in August 2007 he obtained approval from Pioneer's other officers to enroll in Pioneer's plan as a means

of compensation.  Plude explains that his firm ceased billing
Pioneer for the accounting services it provided after Plude was
enrolled in Pioneer's health insurance plan.[2]  He also states
that he did not fill out certain fields in his health insurance
application. Plude contends that Petrillo failed to include this
and other exculpatory information in the application for Plude's
arrest warrant.  (Plaintiff's Memorandum of Law in Opposition of
Defendant's Motion for Summary Judgment (Doc. No. 84)
("Plaintiff's Opposition") at 15-22.)

Petrillo submitted the application for a warrant to arrest
Plude.  On June 25, 2009, Plude was arrested pursuant to a
warrant for health insurance fraud in violation of Conn. Gen.
Stat § 53-442 and conspiracy to commit health insurance fraud in
violation of Conn. Gen. Stat. § 53a-48.  On March 4, 2011, the
charges against Plude were nolled in Connecticut Superior Court
without any consideration being given by the plaintiff.

On or about July 9, 2010, Plude and Wilson commenced a
civil action (the "2010 Action") against Pioneer, the Estate of
William Papale, Sr., Christine Papale, Ralph Tirella and
Lorraine Tirella, alleging, among other things, that the
defendants in the 2010 Action "maliciously and intentionally

---

[2] Although the plaintiff states that his accounting firm
continued to bill Pioneer until August 2008, the last invoice
date in that document is August 6, 2007.  (See 56(a)2 Stmt., Ex.
22.)

made for publication false allegations of theft, and other
illegal and unethical acts" to, among others, various
governmental bodies, including the Shelton Police Department,
which resulted in Plude being arrested by the Shelton Police
Department on charges of health insurance fraud and conspiracy
to commit health insurance fraud.  Plude and Wilson subsequently
entered into a settlement with the defendants in the 2010
Action.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of law.
Fed. R. Civ. P. 56(a).  See Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22
F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for
summary judgment, the court may not try issues of fact, but must
leave those issues to the jury. See, e.g., Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks
Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the
trial court's task is "carefully limited to discerning whether
there are any genuine issues of material fact to be tried, not
to deciding them. Its duty, in short, is confined . . . to

issue-finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)(quoting <u>Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by evidence. "[M]ere speculation and conjecture" is

insufficient to defeat a motion for summary judgment. <u>Stern v.</u> <u>Trustees of Columbia University</u>, 131 F.3d 305, 315 (2d Cir. 1997) (quoting <u>Western World Ins. Co. v. Stack Oil</u>, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. <u>Anderson</u>, 477 U.S. at 252.

**III. DISCUSSION**

    **A.   Probable Cause**

    Petrillo argues that summary judgment should be granted in his favor on both claims because he had probable cause to arrest Plude.  The court agrees.

    Probable cause is a defense to both a Section 1983 claim of false arrest and a common law claim for malicious prosecution. "To prevail on a Section 1983 false arrest claim, a plaintiff must establish that (1) the defendant intentionally arrested him or had him arrested, (2) the plaintiff was aware of the arrest, (3) there was no consent to the arrest, and (4) the arrest was not supported by probable cause." <u>Weinstock v. Wilk</u>, 296 F. Supp. 2d 241, 246 (D. Conn. 2003).  "An action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2)

the criminal proceedings have terminated in favor of the
plaintiff; (3) the defendant acted without probable cause; and
(4) the defendant acted with malice, primarily for a purpose
other than that of bringing an offender to justice." McHale v.
W. B. S. Corp., 187 Conn. 444, 447 (1982).

"Probable cause exists when one has knowledge of, or
reasonably trustworthy information as to, facts and
circumstances that are sufficient to warrant a person of
reasonable caution in the belief that an offense has been or is
being committed by the person to be arrested." Betts v.
Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation
marks and citations omitted).  In determining whether police
officers had probable cause to make an arrest, courts examine
the "totality of the circumstances." Bernard v. United States,
25 F.3d 98, 102 (2d Cir. 1994) (quoting Illinois v. Gates, 462
U.S. 213, 230 (1982)).

The relevant offense here was health insurance fraud in
violation of Conn. Gen. Stat. § 53-442.  A person is guilty of
health insurance fraud if he:

> with the intent to defraud or deceive any insurer . .
> . presents or causes to be presented to any insurer or
> any agent thereof any written . . . statement as part
> of . . . an application for any policy of insurance .
> . . knowing that such statement contains any false,
> incomplete, deceptive or misleading information
> concerning any fact or thing material to such claim or
> application, or omits information concerning any fact
> or thing material to such claim or application . . . .

-11-

Id.  Section 53-442 "punishes intentional fraud or deceit in connection with an application for insurance or a claim for benefits under a health insurance policy." Thal v. Berkshire Life Ins. Co., No. 3:98CV11 (AHN), 1999 WL 200697, at *3 (D. Conn. Mar. 24, 1999) (internal quotation marks and citations omitted).

Petrillo had information showing that Plude submitted a health insurance application that contained material misstatements about his professional relationship with Pioneer, in the absence of which misstatements he would have been ineligible for health insurance through Pioneer.  Plude's application for health insurance stated that he worked 40 hours per week for Pioneer and his date of full-time hire was December 17, 2006.  Tirella, Pioneer's Vice President, who had been in charge of hiring since March 2005, gave Petrillo a written statement that Plude was not authorized to receive health insurance through Pioneer because he was never an employee of Pioneer.  Documentation Petrillo obtained showed that from December 17, 2006 through August 2007, Plude was not listed as an employee of Pioneer on various company reports, and continued to be employed by his accounting firm, which billed Pioneer for its services.  Petrillo learned that after September 2007, when Plude's enrollment in Pioneer's health insurance plan became

-12-

effective, Plude's accounting firm ceased billing Pioneer for the accounting services it provided.  Petrillo also learned that, at the same time, Wilson had instructed Pioneer's payroll service provider to add Plude as an employee with an annual salary of $23,316.60, and she stated that a medical deduction of $416.45 per week was needed.  Thus, Petrillo learned, Plude's compensation was in an amount equal to the cost of Plude's medical insurance plus deductions for Social Security, Medicare and federal taxes; thus Plude's net pay from Pioneer was $0.00.  This information strongly suggested (and in fact still suggests) that Plude was not an employee of Pioneer, much less one who worked 30 hours per week or more, but rather had arranged to secure health insurance benefits in exchange for accounting services.

Plude argues that "[w]hen the information that the defendant knew at the time of his warrant application is viewed in totality . . . the defendant could not have reasonably believed that he had probable cause to seek the arrest of the plaintiff for health insurance fraud" because Petrillo had information and documents that "exonerated the plaintiff, or at the very least eviscerated the reasonableness of his belief that the plaintiff was engaged in fraud." (Plaintiff's Opposition at 15, 17-18.)  Plude contends that: he became a Pioneer employee when he was appointed Pioneer's Treasurer in December 2006;

Pioneer's officers were aware that Plude was being added to the
company health insurance policy as of September 2007; Adams, the
representative of the State Board of Accountancy, told Petrillo
that Plude did not fill out certain fields in his health
insurance application; the reason that Plude was not listed as a
Pioneer employee until the third quarter of 2007 on various
Pioneer reports was that he billed Pioneer for his services
through his accounting firm until that time, and beginning in
September 2007 Pioneer began to compensate Plude by paying for
his health insurance; Serra told Petrillo that the Pioneer
employee who asked the Shelton Police Department to help
retrieve certain company records from Plude was not credible;
and there are "several innocuous explanations" for the fact that
Plude was not paid during the week when Wilson did not complete
the payroll journal -- for example, it may have been that
Tirella, who completed the payroll journal in Wilson's absence,
was unfamiliar with the procedure for compensating Plude.
(Plaintiff's Opposition at 20-21.)

　　Despite Plude's arguments to the contrary, the court
concludes that the additional information that Plude identifies
does not create a genuine issue of material fact as to whether
Petrillo had probable cause to seek Plude's arrest.  His
argument is unavailing for two reasons.  First, as to whether
Petrillo knew that Plude had not filled out certain parts of his

health insurance application, the transcript of Adams's

deposition, read in context, shows that Adams testified that she

did not tell Petrillo that Serra had told her that he had

written part of Plude's application.[3]  Second, Plude does not

contend that Petrillo had been informed that Plude did not fill

---

[3] At Adams's deposition, the following exchange occurred between
Adams and counsel for Plude:

Q:   Did you discuss with Mr. Petrillo Mr. Serra's contention
that he had written certain portions of a health -- of the
healthcare application that was the focus -- part of the focus
of your investigation?  Did you discuss that with Mr. Petrillo?
A:   Yes.
Q: And what -- did you tell Mr. Petrillo Serra claims to have
written some portion of that affidavit or that application, I
should say?
A:   No.
Q:   What did you tell him?
A:   I told him that I had the document that I believe I
provided to him that was initiated from Mr. Plude's office with
information written on it, and that that's what I believed went
to Mr. Serra's office.
Q:   And Mr. Serra, in fact, told you in a communication with
you that he had written some portion of that application.
Correct?
. . .
A:   Yes. And based on my documentation, I did not believe him.
Q:   Wait, wait, wait.  The answer is yes or no.  Did he tell
you that?
A:   Yes.
Q:   You didn't believe him.  Correct?
A:   Yes.
Q:   Did you tell Mr. Petrillo that, that Serra told you he had
written part of the application?  Did you tell that to Petrillo?
A:   No.
Q:   Why not?
A:   I don't know.  We -- our discussion was only about the
contention that Mr. Plude said he was entitled to be on this and
Mr. Serra signed him up.

(56(a)2 Stmt., Ex. 26 at 83-85.)

out the part of the application that states that Plude worked 40 hours per week and was a full time employee.  Nor could he.  In Plude's deposition, he stated that the only fields on the application that he did not fill out were the "Company Name" field, in which someone wrote "Pioner Auto", and the "Firm Division No." field, in which someone wrote "007687".  (56(a)1 Stmt., Ex. G at 1.)  In response to the question "[e]verything else on that form was prepared by you", Plude responded "[y]es." (56(a)2 Stmt., Ex. 2 at 142.)

As to Plude's contention that he became an employee of Pioneer in December 2006 when he became the company's Treasurer, that he was put on Pioneer's health insurance as compensation in September 2007, and that Pioneer's officers knew about this arrangement, these factual disputes are not material.  Plude has provided no evidence showing that, and does not contend that, he was ever a full-time employee of Pioneer, or he ever worked more than the 30 hours per week required to be eligible for health insurance.

Thus, the facts in dispute in this case are not material to whether Petrillo had probable cause to believe that Plude committed health insurance fraud.  It is undisputed that Pioneer employees were only eligible for health insurance through Pioneer if they worked 30 hours or more each week, and Plude offers no evidence that Petrillo ever had any information

tending to show that Plude worked more than 30 hours per week
for Pioneer other than Plude's response on the health insurance
application.  There is no genuine issue as to the fact that
Plude filled out the field on his insurance application that
stated that he worked 40 hours a week, and Plude offers no
evidence that Petrillo had any information tending to show that
Plude did not complete that portion of the application.  Also,
there is no genuine issue as to the fact that the records and
other information Petrillo obtained showed that after September
2007 Plude continued to work for his accounting firm and the
only compensation he received from Pioneer was in the form of
health insurance coverage; Plude offers no evidence that
Petrillo had any information tending to show otherwise, only
evidence that Pioneer executives were aware of Plude's conduct.

    Thus, assessing the record in the light most favorable to
Plude and drawing all reasonable inferences in his favor, the
court concludes that the facts and circumstances known to
Petrillo were sufficient to warrant a person of reasonable
caution to believe that Plude had falsely stated on his health
insurance application that he was a full-time employee of
Pioneer for the purpose of obtaining health insurance through
Pioneer, which was only available to employees of the company
who worked more than 30 hours per week.  There being no genuine
issue of material fact as to whether Petrillo had probable cause

to arrest Plude for health insurance fraud, Petrillo is entitled
to summary judgment.

    **B.   Qualified Immunity**

    Qualified immunity is a complete defense to a Section 1983
false arrest claim.  Ackerson v. City of White Plains, 702 F.3d
15, 21 (2d Cir. 2012), as amended (Dec. 4, 2012).  An arresting
officer is entitled to qualified immunity even when probable
cause to arrest does not exist, "if he can establish that there
was 'arguable probable cause' to arrest." Escalera v. Lunn, 361
F.3d 737, 743 (2d Cir. 2004).

    "Arguable probable cause exists if either (a) it was
objectively reasonable for the officer to believe that probable
cause existed, or (b) officers of reasonable competence could
disagree on whether the probable cause test was met." Escalera
at 743 (internal quotation marks omitted).  Although the
qualified immunity test "is more favorable to the officers than
the one for probable cause . . . [i]f officers of reasonable
competence would have to agree that the information possessed by
the officer at the time of arrest did not add up to probable
cause, the fact that it came close does not immunize the
officer." Ackerson v. City of White Plains, 702 F.3d 15, 21 (2d
Cir. 2012), as amended (Dec. 4, 2012).

    As discussed above, the information Petrillo had strongly
suggested (and in fact still suggests) that at the time Plude

-18-

was enrolled in Pioneer's health insurance plan, he was not an
employee of Pioneer, much less one who worked 30 hours per week
or more, but rather had arranged to secure health insurance
benefits in exchange for accounting services.  Thus, assuming
arguendo that a genuine issue of material fact exists as to
whether Petrillo had probable cause to arrest Plude for health
insurance fraud, under the "more favorable" test for arguable
probable cause, Ackerson, 702 F.3d at 21, it was objectively
reasonable for Petrillo to believe that probable cause existed
and officers of reasonable competence could disagree on whether
the probable cause test was met.  Therefore, Petrillo would be
entitled to qualified immunity as to Plude's Section 1983 false
arrest claim.

> **C.    Release and Settlement Agreement**

Petrillo argues that summary judgment should be granted in
his favor on both claims because the release in the 2010 Action
bars claims against Petrillo in this action.  The court
disagrees.

The pertinent language of the release, which was between
the plaintiffs in the 2010 Action (Plude and Wilson) and the
defendants in the 2010 Action (Pioneer, Christine Papale, Ralph
Tirella, and Lorraine Tirella) provides as follows:

> Plaintiffs . . . hereby irrevocably and
> unconditionally release, acquit, and forever discharge
> all Defendants and the Estate, their respective

present, past and future owners, affiliates, related
business entities, parent companies, subsidiaries,
predecessors, successors, representatives, insurers
(including specifically, Twin City Fire Insurance
Company and The Hartford Insurance Company),
attorneys, in their individual and representative
capacities, and <u>all persons acting by, through, under,
or in concert with any of these</u> . . . from any and all
charges, complaints, claims, liabilities, obligations,
suits . . . that Plaintiffs had, now have, or in the
future may or could have, arising out of or relating
to any matter or event up to the date of the execution
of this Agreement . . . . Nothing in this Release,
however, is intended to release any claims that the
Plaintiffs may now have against the non-parties F.W.
Serra Inc. or Frederick W. Serra."

(56(a)2 Stmt., Ex. 25 at 3.)

Connecticut General Statutes § 52-572e, analyzed in <u>Sims v.
Honda Motor Co.</u>, 225 Conn. 401 (1993), is dispositive of this
issue. "Under § 52-572e . . . the contracting parties' intent,
not the operation of a legal rule, determines the scope of a
release." <u>Id.</u> at 414. "[E]xtrinsic evidence of intent is
appropriately considered in determining the scope of a general
release . . . . [This] is a departure from the general rule of
contract construction that unambiguous contract provisions are
to be given their plain meaning without reference to evidence
outside the four corners of the agreement." <u>Id.</u> at 415.

Here, the parties to the 2010 Action drafted a release, and
the defendants to the 2010 Action or their insurers paid Plude
and Wilson for the release.  The release specifically names the
plaintiffs in the 2010 Action and their insurers, and excludes

non-parties F.W. Serra Inc. and Frederick W. Serra.  It does not
name Petrillo or any of the parties to this action.  After the
parties to the 2010 Action executed the release, Plude brought
this action against Petrillo and the defendants in this case.

Although Petrillo emphasizes that Serra was specifically
excluded from the release but Petrillo was not, their respective
relationships to the controversy between Plude and Wilson and
the defendants in the 2010 Action are different.  There is some
ambiguity as to whether Plude and Wilson could have alleged that
Serra acted "by, through, under, or in concert with" Pioneer by
"maliciously and intentionally [making] for publication false
allegations of theft, and other illegal and unethical acts" to,
among others, the Shelton Connecticut Police Department.
(Memorandum of Law in Support of Defendant's Motion for Summary
Judgment (Doc. No. 80-1) ("Defendant's Memorandum") at 33-34;
56(a)2 Stmt., Ex. 25; 56(a)1 Stmt. ¶ 54.)  There is no such
ambiguity as to Petrillo, who may have acted "in response to"
Pioneer's request to help retrieve the company's records from
Plude, as the plaintiff contends, but did not act "by, through,
under, or in concert with" Pioneer or its employees at any time.
Defendant's Memorandum" at 33; 56(a)2 Stmt., Ex. 25.)

Considering the language employed in the release and taking
into consideration the circumstances of the parties and their
other conduct, the clear intent of the release was that it not

cover Petrillo. <u>See</u> <u>Cantonbury Heights Condo. Ass'n, Inc. v.</u> <u>Local Land Dev., LLC</u>, 273 Conn. 724, 734 (2005) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction.").

**IV.   CONCLUSION**

For the reasons above, the Defendant's Motion for Summary Judgment (Doc. No. 80) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 9th day of March 2015, at Hartford, Connecticut.


_____/s/_____

Alvin W. Thompson
United States District Judge
